## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| INFERNAL TECHNOLOGY, LLC, et al. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:18-cv-1397-M |
| | § | |
| ACTIVISION BLIZZARD INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO STRIKE PLAINTIFFS' SECOND AMENDED INFRINGEMENT CONTENTIONS

Before the Court is Defendant's Motion to Strike Plaintiffs' Second Amended Infringement Contentions. (ECF No. 111). For the reasons stated below, the Motion to Strike Plaintiffs' "2D data" amendments is **GRANTED**, and the Motion to Strike the publicly available screenshots, amended claim descriptions and narratives, the "textures" amendments for the Named Accused Games, and contentions about Spyro Reignited Trilogy are **DENIED.**

### I.    Factual and Procedural Background

Plaintiffs filed this lawsuit on May 31, 2018, alleging infringement of U.S. Patent Nos. 6,362,822 and 7,061,488 ("the Asserted Patents"). (ECF No. 1). In their Complaint, Plaintiffs define "Accused Games" as "all [] games developed, published, distributed, and/or sold by [Defendant] that use the Accused Game Engines," one of which is Unreal Engine 4. (ECF No. 1 ¶¶ 5–6). Plaintiffs previously claimed infringement of the Asserted Patents in a suit against Electronic Arts, Inc. ("the *EA* case"), in which a claim construction order issued on September 28, 2016. *Infernal Tech., LLC v. Elec. Arts Inc.*, No. 2:15-cv-01523-JRG-RSP, 2016 WL 9000458 (E.D. Tex. Nov. 21, 2016).

1

In their original infringement contentions filed in this case on November 2, 2018, Plaintiffs accused many of Defendant's games by name of infringement (the "Original Named Accused Games"), as well as all those that use certain game engines, including Unreal Engine 4 (ECF No. 122 at 3020–27) (together, the "Accused Games").  On November 13, 2018, Defendant released a new game, Spyro Reignited Trilogy ("Spyro"), which uses Unreal Engine 4.

On January 14, 2019, Plaintiffs began reviewing source code for the Original Named Accused Games.  (ECF No. 113-1 at 2).  On March 6, 2019 Defendant identified Spyro as using Unreal Engine 4.  (*See id.* at 2; *see also* ECF Nos. 112-1 at 16, 112-2 at 43).

On June 14, 2019, Plaintiffs requested and received extensions of the deadline to supplement their infringement contentions: to July 12, 2019, for Accused Games not developed by Bungie, Inc., and to July 26, 2019, for Accused Games developed by Bungie.  (ECF No. 87).  On June 21, 2019, Plaintiffs requested Spyro's source code from Defendant.  (ECF No. 112-1 at 16).  On July 12, 2019, Defendant agreed to make Spyro's source code available for inspection. (ECF No. 120 at 3–4).

On July 19, 2019, Plaintiffs sought, and shortly thereafter received, a second extension, to August 5, 2019, but only for Accused Games developed by Bungie.  (ECF Nos. 98–99).  Spyro was not developed by Bungie.  *Spyro Reignited Trilogy*, https://www.spyrothedragon.com (last visited Feb. 10, 2020); *Toys for Bob—Games*, https://www.toysforbob.com/games (last visited Feb. 10, 2020) (listing Spyro as one of Toys for Bob's games).

On July 24, 2019, Plaintiffs finished reviewing source code for the Original Named Accused Games and Spyro.  (ECF No. 113-1 at 2, 5).  Plaintiffs did not request or obtain additional extensions of deadlines on filing supplemental infringement contentions.

2

The Court issued its Claim Construction Order on September 6, 2019. (ECF No. 105). On October 7, 2019, without leave of Court, Plaintiffs served their Second Amended Infringement Contentions, which added infringement contentions regarding Spyro and amendments regarding the "light image data" term and various "textures" for many Original Named Accused Games. (ECF Nos. 113-1 at 3, 113-3 at 19–20[1], 120 at 11). Fact discovery ends on May 29, 2020, expert reports for any party with the burden of proof on an issue are due on June 30, 2020, and trial is set for January 8, 2021. (ECF No. 73 at 1, 6, 8).

On October 24, 2019, Plaintiffs withdrew their claims against some of the Original Named Accused Games, leaving nineteen games (the "Named Accused Games"). (*See* ECF No. 113-1 at 3).

On November 15, 2019, Defendant filed this Motion to Strike Plaintiffs' Second Amended Infringement Contentions under Local Patent Rules 3-6 and 3-7.

## II.    Legal Standard

As a preliminary matter, a court may take judicial notice of "self-evident truths that no reasonable person could question" such that there "is to be no evidence . . . in disproof." *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 348 (5th Cir. 1982). Here, it is clear from Spyro's official website, as well as Toys for Bob's website, that it was developed by Toys for Bob, not Bungie. *Spyro Reignited Trilogy*, https://www.spyrothedragon.com (last visited Feb. 10, 2020) (showing an icon at the bottom of the homepage for the developer Toys for Bob); *Toys for Bob— Games*, https://www.toysforbob.com/games (last visited Feb. 10, 2020) (listing Spyro as one of

---

[1] *See also* ECF No. 112-6 at 220–21, 328–29, 367–69, 448–50, 521–23, 594–96, 656–58, 709–11, 821–22, 875–77, 1006–08, 1086–88, 1164–66, 1231–33, 1303–05, 1384–86, 1466–68, 1537–39, 1609–11, 1685–87, 1767–69, 1849–51, 2014–16, 2174–76.

Toys for Bob's games).  Thus, the Court takes judicial notice of the fact that Spyro was not developed by Bungie.

The Local Patent Rules of this Court govern the requirements for filing infringement contentions.  *Indus. Print Techs., LLC v. O'Neil Data Sys., Inc.*, No. 3:15-cv-01101-M, 2018 WL 398745, at *3 (N.D. Tex. Jan. 11, 2018) (Lynn, J., presiding); Misc. Order No. 62.  "The purpose of infringement contentions is to provide notice of a plaintiff's specific theories of infringement." *CommScope Techs. LLC v. Dali Wireless, Inc.*, No. 3:16-cv-0477-M, 2018 WL 4566130, at *1 (N.D. Tex. Sept. 21, 2018).  Such notice streamlines discovery and narrows the issues for trial. *Id.*

Local Patent Rule 3-1 is designed to "require[] a party claiming patent infringement to disclose its asserted claims and preliminary infringement contentions early in the litigation so that 'the case takes a clear path, focusing discovery on building precise final infringement [] contentions and narrowing issues for Markman, summary judgment, trial, and beyond.' " *Indus. Print Techs.*, 2018 WL 389745, at *3 (quoting *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, 2012 WL 9148157, at *2 (N.D. Tex. Feb. 10, 2012)).

### A.  Amendment Under Local Patent Rule 3-6(a)

"[U]nlike the liberal policy for amending pleadings, the philosophy behind amending claim charts . . . is decidedly conservative."  *Genetech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 774 (Fed. Cir. 2002).  However, Local Patent Rule 3-6(a) provides:

> If a party claiming patent infringement believes in good faith that the presiding judge's claim construction ruling so requires, that party may serve final infringement contentions without leave of court that amend the party's preliminary infringement contentions with respect to the information required by paragraph 3-1(a)(3) and (4) within 30 days from the date the presiding judge's claim construction ruling is filed.

4

This rule "permits a party to respond to an unexpected claim construction by the court." *Indus. Print Techs.*, 2018 WL 398745, at *4; *see also SSL Servs., LLC v. Citrix Sys., Inc.*, No. 2:08-cv-158-JRG, 2012 WL 12904284, at *2 (E.D. Tex. Mar. 16, 2012) (interpreting an identical local rule).  However, "[c]ourts seldom simply adopt the construction of one party or the other." *Nike, Inc. v. Adidas Am. Inc.*, 479 F. Supp. 2d 664, 668 (E.D. Tex. 2007).  Thus, "[a] party cannot argue that because its precise proposal for a construction of a claim term is not adopted by the court, it is surprised and must prepare new infringement contentions." *Indus. Print Techs.*, 2018 WL 398745, at *5; *see also Dr. Ford Albritton, IV v. Acclarent, Inc.*, No. 3:16-cv-03340-M, slip op. at 6 (N.D. Tex. filed Apr. 5, 2019) (Lynn, J., presiding) (finding the rejection of a party's proposed construction insufficient to claim surprise); *IDB Ventures, LLC v. Charlotte Russe Holdings, Inc.*, 360 F. Supp. 3d 541, 553 (E.D. Tex. 2018) (finding no surprise where the court adopted constructions that were somewhat different from the parties' proposals).

### B.  Good Cause Exception Under Local Patent Rule 3-7(b)

Under Local Patent Rule 3-7(b), a party may amend its infringement contentions "only by order of the presiding judge upon a showing of good cause."  Misc. Order No. 62 ¶ 3-7(b); *see also CommScope*, 2018 WL 4566130, at *2.  Good cause does not exist "merely because new evidence was revealed during discovery."  *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 (Fed. Cir. 2006).

Good cause requires a showing of diligence by the party seeking to amend.  *Id.*  Courts consider three other factors to determine whether good cause exists: the importance of the amendment, the danger of unfair prejudice, and the availability of a continuance.  *CommScope*, 2018 WL 4566130, at *2; *see also Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1035 (Fed. Cir. 2015) (reviewing Local Patent Rule 3-6(b)); *Mobile Telecomms., Techs., LLC v.*

*Blackberry Corp.*, 3:12-cv-1652-M, 2015 WL 12698061, at *1 (N.D. Tex. May 19, 2015) (Lynn, J., presiding).  However, several factors weighing "slightly" in a party's favor cannot overcome "weighty diligence flaws."  *See Summit 6 LLC v. HTC Corp.*, No. 7:14-cv-00014-O, 2014 WL 11514929, at *8 (N.D. Tex. Nov. 16, 2014); *see also Davis-Lynch, Inc. v. Weatherford Int'l, Inc.*, No. Civ. A. 6:07-cv-559, 2009 WL 81874, at *4–5 (E.D. Tex. Jan. 12, 2009) (finding a lack of diligence outweighed other factors, even where importance weighed slightly in favor of amendment and prejudice was insubstantial).

### III.    Analysis

#### A.  Spyro Was Already an Accused Game

As a preliminary issue, Defendant asserts that Plaintiffs' Second Amended Infringement Contentions improperly add Spyro as a newly accused game, but the Complaint accuses "all [] games developed, published, distributed, and/or sold by [Defendant] that use the Accused Game Engines," which includes Spyro's game engine, Unreal Engine 4.  (ECF No. 1 ¶¶ 5–6).  In Plaintiffs' original infringement contentions, Plaintiffs also alleged that "all [] video games that use [] Unreal Engine 4 . . . ." infringe the Asserted Patents.  (ECF No. 122 at 3021).  While Spyro was not among the games Plaintiffs specifically named in the Complaint and original infringement contentions, Local Patent Rule 3-1(a)(2) only requires a party's infringement contentions to identify each infringing product "by name[] if known."  Plaintiffs filed their Complaint on May 31, 2018, and served their original infringement contentions on November 2, 2018, but Defendant did not identify Spyro as using Unreal Engine 4 until March 6, 2019.  (*See* ECF No. 113-1 at 2; *see also* ECF Nos. 112-1 at 16, 112-2 at 43).  Thus, Plaintiffs had no reason to know before that date that Spyro used an accused game engine, but Plaintiffs'

Complaint and original infringement contentions were broad enough to include Spyro as an Accused Game.

### B. Amendments Under Local Patent Rule 3-6(a)

#### 1. Infringement Contentions About Spyro

Plaintiffs do not assert that the new infringement contentions naming Spyro arise from the Court's Claim Construction Order. (ECF No. 120). Thus, Local Patent Rule 3-6(a) does not provide support for Plaintiffs' addition of infringement contentions about Spyro.

#### 2. Other Amendments

Plaintiffs' other amendments concern the "light image data" term and various "textures" for many Named Accused Games. (ECF Nos. 113-1 at 3–5, 113-3 at 19–20[2], 120 at 11). Plaintiffs argue that the Court's construction of "light image data" as "2D data" was unexpected because it was "materially different from the parties' proposed constructions and the construction of the term by the court in the [*EA*] Case." (ECF No. 120 at 7).

---

[2] *See also* ECF No. 112-6 at 220–21, 328–29, 367–69, 448–50, 521–23, 594–96, 656–58, 709–11, 821–22, 875–77, 1006–08, 1086–88, 1164–66, 1231–33, 1303–05, 1384–86, 1466–68, 1537–39, 1609–11, 1685–87, 1767–69, 1849–51, 2014–16, 2174–76.

The constructions of "light image data" by the parties, the *EA* Court, and this Court are as follows:

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction | *EA* Court's Construction | This Court's Construction |
|---|---|---|---|
| "for each of the plurality of light sources, *data* representing an image of the light emitted by the light source to illuminate the scene as viewed from the light source's perspective"<br><br>(stating that "Plaintiffs' proposed construction adopts the [*EA*] Case Claim Construction Ruling") | "for each of the plurality of light sources, *pixel data values* representing the light emitted by the light source to illuminate the scene as viewed from the light source's perspective" | "for each of the plurality of light sources, *data* representing an image of the light emitted by the light source to illuminate the scene as viewed from the light source's perspective" | "for each of the plurality of light sources, *2D data* representing the light emitted by the light source to illuminate the scene as viewed from the light source's perspective" |

(emphasis added to all) (*See* ECF Nos. 102-1 at 1–2, 105 at 31); *see also Infernal Tech., LLC v. Elec. Arts Inc.*, No. 2:15-cv-1523-JRG-RSP, 2016 WL 5415429, at *11 (E.D. Tex. Sept. 28, 2016).

In its Claim Construction Order, this Court recognized that the parties disputed "whether light image data is necessarily in the form of pixels," and stated that it "agrees with the [*EA* court] to the extent that 'light image data' is 2D data . . . ." (ECF No. 105 at 29–30). Plaintiffs argue that the *EA* court "did not construe light image data to be **limited** to 2D data," and thus that this Court's construction of "light image data" as "2D data" was unexpected. (ECF No. 120 at 9). The Court disagrees.

The *EA* court first defined "lighting data" as 2D data, and then recognized that "lighting data" is composed of "light image data." In defining "modeled point within said scene," the *EA*

court referenced "lighting data" as one of two "2D views of the scene." *Elec. Arts Inc.*, 2016 WL 5415429, at *15. As the *EA* court explained:

> "[M]odeled point within said scene" refers to a point on a modeled 3D object within the simulated scene. But this does not mean that the "comparing" step necessarily is comparing 3D data. Rather, the claim language expresses that the comparison is between observer data and lighting data, *both of which represent 2D views of the scene*.

*Id.* (emphasis added). In characterizing "lighting data" as representing a "2D view[] of the scene," the *EA* court therefore limited "lighting data" to 2D data.

The *EA* court then recognized that "lighting data" is composed of "light image data." In the *EA* court's construction of the clause "lighting data including image data," the *EA* court noted that "the parties agreed that *light image data is required for each light source*," and thus that no further construction of that clause was necessary. *Elec. Arts Inc.*, 2016 WL 5415429, at *9–10 (emphasis added). Thus, by holding that "lighting data" is necessarily 2D data, and that "lighting data" is composed of "light image data," the *EA* court also held that "light image data" is necessarily 2D data. The *EA* court's statement that " 'light image data' necessarily represents scene lighting from the 2D perspective of the light source" further supports this conclusion. (*See id.* at 10).

Thus, by defining "light image data" as "2D data," this Court adhered to the *EA* court's construction, and therefore this Court's construction was not unexpected. Thus, because Plaintiffs argue that this Court's construction of "light image data" justifies their amendments regarding the "light image data" term and various "textures" for many Named Accused Games, Local Patent Rule 3-6(a) does not support these amendments. (*See* ECF No. 120 at 11).

### C.  Good Cause Exception Under Local Patent Rule 3-7(b)

#### 1.  "2D Data" Amendments

For the purposes of this section, "2D data" amendments are those that relate to Plaintiffs'

alleged surprise at the Court's construction of "light image data."  (*See* ECF No. 120 at 13–19).

##### a)  Diligence of Plaintiffs

Plaintiffs argue that they were diligent in serving their amendments regarding "light image

data" because "the first time Plaintiffs had any reason to believe that 'light image data' might be

limited to 2D data is when the Court issued its claim construction ruling on September 6, 2019."

(*Id.* at 15).  However, as discussed, the Court's construction of "light image data" as "2D data"

mirrored the *EA* court's construction, and Plaintiffs therefore "could [] have anticipated the full

scope of the amendments needed without the [Court's Claim Construction Order before them]."

*See* discussion *supra* Part III.B.2; *see also GPNE Corp. v. Apple Inc.*, Nos. 5:12-cv-02885-LHK-

PSG, 5:12-cv-03057-LHK-PSG, 2013 WL 6157930, at *2 (N.D. Cal. Nov. 22, 2013).  Thus,

Plaintiffs' lack of diligence weighs strongly against a finding of good cause.

##### b)  Importance of Amendments

Plaintiffs do not argue that their amendments related to "light image data" are important.[3]

In fact, Plaintiffs state that these amendments "only assist" Defendant in better understanding

their infringement theory, that allowing them would be "at worst harmless," and that they "may

not be necessary to enable them to prove the 2D data requirement at trial."  (ECF No. 120 at 16

(citing *ZitoVault, LLC v. Int'l Bus. Machines Corp.*, No. 3:16-cv-0962-M, 2018 WL 2971179, at

*1 (N.D. Tex. Mar. 29, 2018) (Lynn, J., presiding) (holding that "[i]nfringement

---

[3] However, Plaintiffs assert that such amendments would be "vitally important" if Defendant argues that Plaintiffs should be precluded at trial from "proving precisely what the amendments show," which is how the source code allegedly satisfies the 2D data requirement.  Because Defendant has not raised such arguments, the Court finds it improper to consider such speculation for the purposes of this Order.

contentions . . . are not meant to require a 'party to prove its case of infringement or provide a forum for litigation of the substantive issues' ")).  Plaintiffs' delay in serving these amendments only after the Court's Claim Construction Order despite the existing holding from the *EA* court defining "light image data" as "2D data" also undermines their importance.  *See* discussion *supra* Part III.B.2; *see also iLife Techs., Inc. v. Nintendo of Am., Inc.*, No. 3:13-cv-04987-M, slip op. at 32 (N.D. Tex. filed May 30, 2017) (Lynn, J., presiding); *Davis-Lynch, Inc. v. Weatherford Int'l*, Inc., No. Civ. A. 6:07-cv-559, 2009 WL 81874, at *4 (E.D. Tex. Jan. 12, 2009).  Thus, the relative unimportance of the amendments weighs against a finding of good cause.

### c)  Danger of Unfair Prejudice

Courts have found no prejudice to amend contentions where sufficient time remains to conduct fact discovery and complete expert reports before trial.  *See, e.g., Indus. Print Techs., LLC v. O'Neil Data Sys., Inc.*, No. 3:15-cv-01101-M, 2018 WL 398745, at *7 (N.D. Tex. Jan. 11, 2018) (Lynn, J., presiding) (finding no prejudice where the amendments were served five months before the close of fact discovery, eight months before expert reports were due, and where the case was not set for trial) (comparing to the Court's finding of prejudice in *iLife Techs., Inc. v. Nintendo of Am., Inc.*, No. 3:13-cv-04987-M, slip op. at 35 (N.D. Tex. filed May 30, 2017) (Lynn, J., presiding), in which defendant moved to amend three months after fact discovery closed and four months before trial)); *see also, e.g., Dr. Ford Albritton, IV v. Acclarent, Inc.*, No. 3:16-cv-03340-M, slip op. at 10–11 (N.D. Tex. filed Apr. 5, 2019) (Lynn, J., presiding) (finding prejudice where fact discovery and expert report deadlines had both expired at the time of amendment).

Here, Plaintiffs served their Second Amended Infringement Contentions more than seven and eight months before the fact discovery and expert report deadlines, respectively, and more

than a year before trial.  (*See* ECF Nos. 113-1 at 3–5, 113-3 at 19–20[4], 120 at 11, 73 at 6). Sufficient time remains for Defendant to make "strategic decisions . . . pursue certain discovery, retain certain experts, and adopt certain positions."  *See iLife Techs.,* No. 3:13-cv-04987-M, slip op. at 34–35.  Thus, the low danger of unfair prejudice weighs in favor of a finding of good cause.

### d)  Availability of Continuance

Given that trial is not until January 2021, the Court need not consider whether a continuance is available to cure any prejudice.  Thus, this factor weighs in favor of a finding of good cause.

While the prejudice and availability of continuance factors weigh in favor of a finding of good cause, they do not overcome Plaintiffs' lack of diligence in delaying serving its amendments until after the Court's Claim Construction Order.  *See Summit 6 LLC v. HTC Corp.*, No. 7:14-cv-00014-O, 2014 WL 11514929, at *8 (N.D. Tex. Nov. 16, 2014); *see also* discussion *supra* Part III.B.2.  Given Plaintiffs' acknowledgement of the amendments' relative unimportance, as well, the Court finds that good cause does not exist, and therefore that Local Patent Rule 3-7(b) does not support Plaintiffs' "2D data" amendments.  Thus, Defendant's Motion to Strike Plaintiffs' "2D data" amendments, as described in this section, is **GRANTED**.

### 2.  "Non-2D Data" Amendments

For the purposes of this section, except for the infringement contentions regarding Spyro, "non-2D data" amendments are those that do not relate to Plaintiffs' alleged surprise at the Court's construction of "light image data."  (See ECF No. 120 at 19–21).  Instead of alleging

---

[4] *See also* ECF No. 112-6 at 220–21, 328–29, 367–69, 448–50, 521–23, 594–96, 656–58, 709–11, 821–22, 875–77, 1006–08, 1086–88, 1164–66, 1231–33, 1303–05, 1384–86, 1466–68, 1537–39, 1609–11, 1685–87, 1767–69, 1849–51, 2014–16, 2174–76.

surprise, Plaintiffs reason that it "made sense" to provide additional "clarifying material" when they served their other amendments.  (*Id.* at 19).  Courts have found good cause where amendments "simply flesh out the allegations in the original infringement contentions in light of the Court's claim construction" and "there is no new claim, product, or theory of infringement added in that new material."  *See IDB Ventures, LLC v. Charlotte Russe Holdings, Inc.*, 360 F. Supp. 3d 541, 558–59 (E.D. Tex. 2018) ("The act of providing additional detail to a theory already set forth in the original infringement contentions does not justify striking a party's amended infringement contentions").  This is because "the added details . . . simply set out what the Court's constructions have required [Plaintiffs] to prove, which comes as no surprise to [Defendant]."  *See id.* at 559.

### a)  Publicly Available Screenshots and Amended Claim Descriptions and Narratives

Here, Plaintiffs state that such "clarifying material" consists of "screenshots of publicly available information" to illustrate Defendant's alleged infringement and "incorporate[s] the Court's final claim constructions [referring to "light image data"] in the description of each claim term and the narrative discussing the claim term."  (ECF No. 120 at 19; *see also* ECF No. 111 at 14–15).  Defendant does not contest that these amendments are clarifications, but argues that the Court should strike them for Plaintiffs' failure to explain why they "could not have been anticipated prior to the Court's claim construction[]."  (*Id.* at 15).

Defendant's criticism is misplaced.  Defendant assumes that such amendments can only be justified by Plaintiffs' surprise at the Court's claim construction order, but, as discussed, courts have permitted amendments that merely clarify an existing infringement theory "in light of the Court's claim construction" of a term.  *See, e.g., IDB Ventures*, 360 F. Supp. 3d at 558.  Plaintiffs did not have to allege surprise at the Court's Claim Construction Order to use its

findings as sufficient reason to clarify its existing infringement theories, as such clarification does not prejudice Defendant. *See id.* Thus, good cause exists, and Defendant's Motion to Strike the publicly available screenshots and amended claim descriptions and narratives, as described in this section, is **DENIED**.

### b) "Textures" Amendments for Named Accused Games

Defendant also alleges that Plaintiffs' amendments assert new infringement theories centered on "different types of 'textures' as alleged support for the 'providing lighting data' step and the 'light image data' term" for seventeen Named Accused Games. (ECF No. 111 at 4, 14; *see also* ECF No. 123 at 8). These "textures" amendments describe how a Named Accused Game's engine displays objects, as in the following addition to the claim chart for Skylanders: SuperChargers:[5]

> The Alchemy Engine models a light source, in part, using a "texture" that stores an image that is projected onto the objects in the scene. Generally, a light source's texture may comprise what is referred to as a "cookie"/"cucoloris" texture, a "gobo" texture, a "projection"/"projective" texture, or an "IES"/"IES profile" texture, for example.
>
> . . . .
>
> The Alchemy Engine uses a light source's "projection" texture, for example, to illuminate objects in the scene. This texture comprises "2D data representing the light emitted by the light source to illuminate the scene as viewed from the light source's perspective." From the perspective of the light source, objects in the scene are "masked" or "filtered" according to the light's texture(s). For example, in the case of a unidirectional light source, such as a box light, the light source "sees" the objects in the scene that fall within the light's field of view along the direction the light source is facing; such objects are illuminated according to the value(s) in the light source's texture(s) at a location corresponding to the objects' positions from the perspective of the light source.

---

[5] Defendant states that it requested confirmation from Plaintiffs that the redline comparisons of Plaintiffs' First and Second Amended Infringement Contentions that Defendant provided were accurate, but that Plaintiffs have not responded. (ECF No. 113-1 at 3–4). Nevertheless, Plaintiffs rely on the same two paragraphs in their Response, so it is assumed that Plaintiffs do not contest their accuracy. (ECF No. 120 at 12).

(ECF No. 112-5 at 763–64).  As Plaintiffs note, "these paragraphs describe a 'texture' and how [it] meets the . . . '2D data' limitation within [the Court's] construction of 'light image data.' " (*See* ECF No. 120 at 11).

The discussion of "textures" is not unique to Plaintiffs' Second Amended Infringement Contentions.  Plaintiffs discussed "projection texture" in their First Amended Infringement Contentions.  (*See id.* at 12; *see also* ECF No. 122 at 3017).  Defendant's objection to their inclusion in the Second Contentions rests on the addition of the new textures: "cookie"/"cucoloris" texture, "gobo" texture, and "IES"/"IES profile" texture.  However, Defendant does not explain how these references to textures embody new infringement theories. These are descriptions of the various textures that may make up "a light source's texture."  (ECF No. 112-5 at 763).  Thus, like the publicly available screenshots and amended claim descriptions and narratives, these new "textures" only clarify an existing infringement theory.  *See IDB Ventures, LLC v. Charlotte Russe Holdings, Inc.*, 360 F. Supp. 3d 541, 558–59 (E.D. Tex. 2018). Thus, good cause exists, and Defendant's Motion to Strike the "textures" amendments is **DENIED**.

### 3.  Infringement Contentions Relating to Spyro

#### a)  Diligence of Plaintiffs

On March 6, 2019, during discovery, Defendant identified Spyro as using one of the allegedly infringing game engines, Unreal Engine 4.  (ECF No. 111 at 3; *see also* ECF Nos. 112-1 at 16, 112-2 at 43).  Given the delays by both parties in requesting and obtaining the code, the Court does not consider these facts to establish Plaintiffs' lack of diligence.  *See BookIT Oy v. Bank of Am. Corp, et al.*, 3:17-cv-2577-K, slip op. at 11 (N.D. Tex. filed Feb. 11, 2019).

However, other facts do show a lack of diligence by Plaintiffs.  On June 14, 2019, Plaintiffs received their first requested extension of the deadline to supplement their infringement contentions, to July 12, 2019, for Accused Games not developed by Bungie, Inc.  (ECF No. 87).  On July 19, 2019, Plaintiffs sought, and shortly thereafter received, their second extension, to August 5, 2019, for Accused Games developed by Bungie.  (ECF Nos. 98–99).  Because Spyro was not developed by Bungie, the deadline for Plaintiffs to serve infringement contentions was July 12, 2019.  If Plaintiffs were not able to decide whether to serve infringement contentions for Spyro by that date, whether because of the time needed for review or inability to access the source code or for some other reason, Plaintiffs should have requested an extension from the Court.  Instead, Plaintiffs waited nearly three more months before serving infringement contentions about Spyro, without seeking leave of Court.  (ECF Nos. 113-1 at 3, 113-3 at 19–20[6], 120 at 11).

Plaintiffs' lack of diligence in failing to obtain an extension exhibits a disregard for the established deadlines.  As the Federal Circuit has noted, the "exclusion of [infringement contentions] is often an appropriate sanction for failure to comply with such deadlines."  *See, e.g., O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1369 (Fed. Cir. 2006) (excluding infringement contentions for failure to comply with case management order due to party's lack of diligence and relative unimportance of excluded material).  The lack of diligence weighs against a finding of good cause.

---

[6] *See also* ECF No. 112-6 at 220–21, 328–29, 367–69, 448–50, 521–23, 594–96, 656–58, 709–11, 821–22, 875–77, 1006–08, 1086–88, 1164–66, 1231–33, 1303–05, 1384–86, 1466–68, 1537–39, 1609–11, 1685–87, 1767–69, 1849–51, 2014–16, 2174–76.

### b) Importance of Amendments

Plaintiffs' Response does not address the importance of infringement contentions regarding Spyro (ECF No. 120), so the Court regards the contentions as relatively unimportant, which weighs against a finding of good cause.

### c) Danger of Unfair Prejudice

For the same reasons discussed in Part III.C.1(c), the Court finds that there is a low danger of unfair prejudice.  In addition, because Spyro was already an Accused Game, Defendant should not have been surprised when Plaintiffs attempted to add infringement contentions for it.  The low danger of unfair prejudice weighs strongly in favor of a finding of good cause.

### d) Availability of Continuance

For the same reason discussed in Part III.C.1(d), this factor weighs in favor of a finding of good cause.

While Plaintiffs' lack of diligence in serving infringement contentions regarding Spyro and the relative unimportance of these contentions weigh against a finding of good cause, the lack of prejudice and availability of continuance factors combine to weigh in favor of a finding of good cause.  Because good cause exists, Local Patent Rule 3-7(b) supports Plaintiffs' addition of infringement contentions regarding Spyro in the Second Contentions.  Thus, Defendant's Motion to Strike infringement contentions regarding Spyro is **DENIED**.

For the foregoing reasons, Defendant's Motion to Strike Plaintiffs' "2D data" amendments is **GRANTED**, and the Motion to Strike the publicly available screenshots, amended claim descriptions and narratives, the "textures" amendments for the Named Accused Games, and contentions about Spyro are **DENIED.**

Plaintiffs are required to file a version of their Second Amended Infringement Contentions that omits the parts stricken by the Court.

**SO ORDERED**.

March 9, 2020.

BARBARA M. G. LYNN
CHIEF JUDGE